DANIEL L. WARSHAW (Bar No. 185365)
dwarshaw@pwfirm.com
MATTHEW A. PEARSON (Bar No. 291484)
mapearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

STEVEN M. NATHAN (Bar No. 153250)
snathan@hausfeld.com
**HAUSFELD LLP**
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322

*Attorneys for Plaintiff*

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| AL MCFALL, individually and on behalf of all others similarly situated, | CLASS ACTION COMPLAINT |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | Case No.: 2:25-cv-5692 |
| EPISOURCE, LLC and SHARP HEALTHCARE, | |
| Defendants. | |

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1036398.1

Plaintiff Al McFall ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class" or "Class Members") against Episource, LLC ("Episource") and Sharp Healthcare ("Sharp") (collectively referred to as "Defendants"), and alleges as follows, based upon information and belief, the investigation of counsel, and the personal knowledge of Plaintiff.

## I.    <u>NATURE OF THE CASE</u>

1.    This "hub-and-spoke" data breach case involves the unauthorized access and exfiltration of the sensitive Personal Identifiable Information ("PII") and Protected Health Information ("PHI") (collectively "Private Information") of over 5.4 million Class Members, including Plaintiff.

2.    The hub in this case is Defendant Episource, one of the nation's largest providers of medical coding and risk adjustment services. During the ordinary course of its business, Episource stores an enormous amount of Private Information generating approximately $2 billion in revenue last fiscal year.

3.    One of the spokes surrounding Episource is Defendant Sharp. Sharp is San Diego's largest healthcare provider.

4.    Sharp is a customer of Episource that used its services and software, and in doing so, entrusted Episource with the Private Information of its patients. The volume of Private Information stored by Sharp on Episource's systems and platform was enormous and, according to Episource's Data Breach Notice, included a broad array of sensitive Private Information, including names, dates of birth, addresses, phone numbers, medical record numbers, health plan information including ID numbers, provider information, and clinical data such as diagnoses and medications.

5.    Over a period of multiple days, in January and February 2025, cybercriminals infiltrated Episource's network and exfiltrated the Private Information of over 5.4 million individuals stored by Episource's customers on Episource's systems and platform (the "Data Breach").

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

6.     Episource's forensic investigation to date has only publicly revealed limited information as to how cybercriminals gained unauthorized exposure to Episource's network and systems, but it is clear the Data Breach occurred because Episource and Sharp failed to implement fundamental and basic security measures that could have prevented the Data Breach.

7.     Plaintiff and Class Members have been substantially injured by Defendants' data security failures. Plaintiff further believes that her and Class Members' Private Information has or will be published for sale on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

8.     As a result of the Data Breach, Plaintiff has suffered numerous injuries, including invasion of privacy, lost time and expenses mitigating the risk of data misuse, the diminishment in value of her Private Information, and failing to receive the benefit of the bargain reached with Defendants.

9.     Plaintiff brings this action to hold Defendants accountable for their data security failures, enjoin their continued failure to implement basic and fundamental data security practices, and recover damages and all other relief available at law on behalf of herself and members of the classes she seeks to represent.

## II.    **PARTIES**

### A.    **Defendants**

10.     Defendant Episource is a privately held end-to-end risk adjustment platform company specializing in point of care solutions for healthcare providers with its headquarters and principal place of business in the city of Gardena, in the County of Los Angeles, in the State of California. Episource is a for-profit company organized and incorporated under its parent company, OptumInsight, Inc. ("OptumInsight"), under the laws of the State of Delaware.

11.     Because Defendant Episource has its headquarters and principal place of business in the State of California, Defendant Episource is a citizen of the States of

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  both California and Delaware.

2      12.    Defendant Sharp is headquartered and has its principal place of business

3  in the County of San Diego, in the State of California.

4      13.    Because Defendant Sharp is headquartered and has its principal place of

5  business in San Diego, California, Sharp is a citizen of California.

6      14.    Defendant Sharp is a customer of Defendant Episource and, on

7  information and belief, used Episource's compromised software.

8      **B.    <u>Plaintiff</u>**

9      15.    Plaintiff Al McFall resides in the County of San Diego, in the State of

10  California, and is a patient of Defendant Sharp.

11      **III.    <u>JURISDICTION AND VENUE</u>**

12      16.    This Court has subject matter jurisdiction pursuant to the Class Action

13  Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy

14  exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than

15  one hundred putative Class Members, and minimal diversity exists because many

16  putative Class Members are citizens of a different state than any Defendant.

17      17.    This Court has personal jurisdiction over Defendants because Defendant

18  Episource maintains its headquarters and principal places of business in this District.

19  Further, Defendants conduct substantial business in this District, engage in the

20  conduct at issue in this District, and/or otherwise have substantial contacts with this

21  District and purposely avail themselves of the Courts in this District.

22      18.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(1)-(2),

23  1391(b)(1) and (2), and 1391(c)(2) as Defendants are both residents of the State of

24  California, at least one Defendant has its principal places of business in this District

25  and a substantial part of the events giving rise to the claims emanate from activities

26  within this District.

27  / / /

28  / / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

# FACTUAL ALLEGATIONS

## IV.    EPISOURCE'S BUSINESS

19.    Defendant Episource touts itself as "a leading provider of risk adjustment services, software, and solutions for health plans and provider groups. As an integrated platform, Episource empowers Commercial, Medicare, and Medicaid payers and providers with end-to-end risk adjustment solutions, including risk adjustment analytics, medical record retrieval, medical chart coding, and encounter submissions."[1]

20.    Episource was founded in 2006 and was acquired by OptumInsight in 2023.

21.    Episource touts its ability to "[e]nabl[e] payers and providers to achieve the best healthcare outcomes at every stage of the risk adjustment continuum."[2]

22.    Episource is best known for its proprietary Episource Clarity Platform ("Platform"), which "addresses five key stages of the risk adjustment continuum": analyze, acquire, code, engage, and submit.[3]

23.    Each of Episource's customers, including Defendant Sharp, stores Private Information of their patients and/or customers on Episource's computers and networks using Episource's offered services and software.

24.    Episource's marketing demonstrates that it is well-aware that data security is a key component of the services it provides to its customers. The following examples illustrate how Episource markets and highlights the strength of its data security practices to entice customers to use Episource's products and services, as well as Episource's awareness of industry guidance and regulations that set standards for effective data security practices:

- Episource understands that "[e]ach time a client shares their data

---

[1] https://www.linkedin.com/company/episource/ (last visited June 19, 2025)
[2] https://www.episource.com/ (last visited June 19, 2025).
[3] *Id.*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

with us, they're placing their utmost trust in us to keep that information safe."

- As a result, Episource claims "[t]hat's why we consistently maintain our compliance certifications year after year. ***At Episource, we are committed to ensuring all of our solutions and services meet the regulatory requirements set by the risk adjustment and healthcare industries.*** We are HITRUST CSF Certified, ISO 27001 Certified, and NIST Certified."[4]

- Episource's Privacy Policy represents "[w]e recognize that the privacy of your information is important."[5]

- Episource's Privacy Policy also represents that "[w]e maintain administrative, technical, and physical safeguards designed to protect the Information that you provide on our Online Services."[6]

25. During the ordinary course of its business (primarily through the operation of its cloud-based databases and Platform), Episource receives the Private Information of individuals, such as Plaintiff and the Class, from Episource's customers, including Defendant Sharp.

26. Because cloud-based databases and software applications like the Platform are prime targets for cybercriminals due to the sheer volume of data they house and transfer, Episource knew of or should have known of the risks of a potential data breach. One recent report has highlighted the risks presented specifically by cloud storage as follows:[7]

> It is estimated that more than 60% of the world's corporate data is stored in the cloud. ***That makes the cloud a very attractive target for hackers. In 2023, over 80% of data***

---

[4] *Id.*
[5] https://www.episource.com/privacy/ (last visited June 19, 2025).
[6] *Id.*
[7] https://hbr.org/2024/02/why-data-breaches-spiked-in-2023 (last visited June 19, 2025)(emphasis added).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

***breaches involved data stored in the cloud***. That is not just because the cloud is an attractive target. In many cases, ***it is also an easy target due to cloud misconfiguration*** – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups.

## V.    SHARP'S BUSINESS

27.    Defendant Sharp is San Diego's largest healthcare provider "with four acute-care hospitals, four specialty hospitals, three affiliated medical groups and one health plan."[8]

28.    Like Episource, Sharp is well-aware of the significance and necessity of data security to its patients. Sharp' Privacy Policy highlights the importance of data security to its patients, including stating that "***[a]t Sharp, protecting your privacy is imperative***. ***We have strict policies and procedures in place to keep your personal health information private***, and every Sharp employee is educated on how to ensure that information remains confidential."[9]

29.    Sharp's Notice of Privacy Practices to its patients informs them that "[w]e understand that information about you and your health is confidential. We are committed to protecting the privacy of this information."[10]

30.    Sharp's Notice of Privacy Practices acknowledges that "***[f]ederal and California law makes us responsible for safeguarding your protected health information***."[11]

31.    In the ordinary course of business, Defendant Sharp receives the Private Information of patients. In turn, Sharp entrusts this Private Information to its third-party vendors and service providers, including Episource.

---

[8] https://www.sharp.com/about (last visited June 19, 2025).
[9] https://www.sharp.com/policies-procedures/privacy-practices (last visited June 19, 2025) (emphasis added).
[10] https://assets.ctfassets.net/pxcfulgsd9e2/7tYHDU0t0tzhepozjO5ohK/199b3ffb7bc f27e9ce08956445917174/notice-of-privacy-practices.pdf (last visited June 19, 2025).
[11] *Id.* (emphasis added).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS,, CALIFORNIA 91403

32.    Sharp is an Episource customer. Sharp stores its current and former patients' Private Information on Episource's software, network, and/or products, and utilizes the Platform.

## VI.    SHARP AND EPISOURCE OBTAIN, COLLECT, USE, AND DERIVE A BENEFIT FROM THE PRIVATE INFORMATION OF PLAINTIFF AND CLASS MEMBERS

33.    Defendants obtain, collect, use, and derive a benefit from the Private Information of Plaintiff and Class Members. Defendants use this Private Information to provide services, generating revenue therefrom. Defendants would not be able to obtain revenue if not for the acceptance and use of this Private Information.

34.    Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

35.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

36.    By collecting Plaintiff's and the Class's Private Information, either directly or indirectly, Defendants assumed legal and equitable duties to Plaintiff and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

37.    Defendants had obligations created by the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    disclosure.

2    38.    Defendants each recognize these obligations in their respective Privacy

3    Policies and marketing to their customers and patients.

4    39.    Defendants' assurances of maintaining high standards of cybersecurity

5    make it evident that Defendants recognized they had a duty to use reasonable

6    measures to protect the Private Information they collected and maintained.

7    40.    Defendants violated their own overt privacy statements and failed to

8    adopt reasonable and appropriate security practices and procedures including

9    administrative, physical security, and technical controls to safeguard Plaintiff's and

10    Class Members' Private Information.

11    41.    As a result, Plaintiff's and Class Members' Private Information was

12    accessed and stolen from Defendants' inadequately secured data systems in a massive

13    and preventable Data Breach.

14    **VII.    THE DATA BREACH**

15    42.    In or around February 2025, Episource became aware that

16    cybercriminals had exploited critical vulnerabilities in Episource's network security,

17    which allowed for unauthorized data access between January 27, 2025, and February

18    6, 2025.

19    43.    Defendants have publicly acknowledged the Data Breach and provided

20    notice of the Data Breach to various entities and individuals, including Plaintiff.

21    Specifically, on April 23, 2025, Episource began notifying customers of the Data

22    Breach and also posted a substitute notice online.[12] In filings with the U.S. Department

23    of Health and Human Services, Episource confirmed that over 5.4 million individuals

24    were affected by the Data Breach.[13]

25    44.    Sharp also posted a notice to patients of the Data Breach, wherein Sharp

26    related it was informed of the Data Breach by Episource, on April 14, 2025, and that

27    _____

28    [12] https://response.idx.us/episource/ (last visited June 19, 2025).

[13] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 19, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS,, CALIFORNIA 91403

"Sharp was one of their customers affected by a ransomware data breach."[14]

45.    Omitted from Defendants' notices were any details about the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures Defendants have undertaken to ensure a similar data breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

46.    These purported "disclosures" amount to no real disclosure at all, as they fail to inform Plaintiff and Class Members, with any degree of specificity, of the critical facts about the Data Breach. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

47.    Defendants failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation. The risk of cyberattacks, such as occurred here, should have been well known to Defendants. Defendants could have taken, but did not take, numerous preventive measures to prevent the Data Breach.

48.    Defendants' actions and inactions represent a flagrant disregard of the rights of Plaintiff and the Class.

## VIII.  RELEVANT INDUSTRY STANDARDS AND REGULATIONS FOR DATA SECURITY DEPARTMENT OF HEALTH AND HUMAN SERVICES WARNINGS

49.    Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise Private Information, Defendants' approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent,

---

[14] https://www.sharp.com/episource-data-breach (last visited June 19, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

and reckless. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendants were maintaining and transferring for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, and this caused the exposure of Private Information.

50.    Defendants' negligence or reckless or knowing disregard of their obligations to safeguard Plaintiff's and the Class Members' Private Information is evinced by the repeated warnings and alerts of which Defendants reasonably should have been aware concerning the need to protect and secure Plaintiff's Private Information, especially in light of the substantial increase in cyberattacks and data breaches in the healthcare and health insurance industries in the years preceding the date of this Data Breach.

51.    Specifically, as early as July 30, 2021, the U.S. Department of Health and Human Services ("HHS") issued an alert about potential threats to healthcare organizations from cyber-attacks.[15] Referring to it as a "nightmare," HHS recommended that healthcare organizations ensure they review the list of recommended mitigations in the Alert and promptly apply them to impacted systems in their infrastructure.[16]

52.    On August 25, 2021, the HHS Cybersecurity Program published another Alert entitled "Indicators of Compromise Associated with Hive Ransomware."[17] The

---

[15] *See* HHS Cybersecurity Program H3: Section Alert (July 30, 2021), HiveNightmare/SeriousSAM Potential HPH Impact, https://www.hhs.gov/sites/default/files/sector-alert-hive-nightmare-serious-sam-tlpwhite.pdf (last visited June 20, 2025).

[16] *See* HHS Cybersecurity Program H3: Section Alert (July 30, 2021), HiveNightmare/SeriousSAM Potential HPH Impact, www.hhs.gov/sites/default/files/sector-alert-hive-nightmare-serious-sam-tlpwhite.pdf (last visited June 20, 2025).

[17] *See* HHS Cybersecurity Program HC3: Alert (August 25, 2021), www.hhs.gov/sites/default/files/iocs-associated-with-hive-ransomware-alert.pdf (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Alert was also widely circulated and reported on by the media after its release.[18] HHS in particular noted that unauthorized parties had targeted entities in the healthcare and public health sector. The Alert, issued in conjunction with the Federal Bureau of Investigation ("FBI"), described recommendations to detect, avoid, and recover from unauthorized party intrusions.[19] The Alert contained a list of specific, technical indicators that would immediately advise companies such as Defendants that a system has been compromised, recognizing that awareness of these indicators could allow for detection during an attack and can help contain or minimize its impact.[20]

53.    The FBI Flash Alert also contained recommended mitigations that companies such as Defendants should immediately undertake:

- Back-up critical data offline.
- Ensure copies of critical data are in the cloud or on an external hard drive or storage device.
- Secure your back-ups and ensure data is not accessible for modification or deletion from the system where the data resides.
- Use two-factor authentication with strong passwords, including for remote access services.
- Monitor cyber threat reporting regarding the publication of compromised VPN login credentials and change passwords/settings if

---

[18] *See, e.g.*, FBI Flash TLP White: Indicators of Compromise Associated with Hive Ransomware – August 25, 2021, American Hospital Association (8/25/21), www.aha.org/fbi-tlp-alert/2021-08-25-fbi-flash-tlp-white-indicators-compromise-associated-hive-ransomware (last visited June 20, 2025).

[19] *See* FBI Flash TLP:White dated August 25, 2021, https://www.aha.org/fbi-tlp-alert/2021-08-25-fbi-flash-tlp-white-indicators-compromise-associated-hive-ransomware (last visited June 20, 2025).

[20] *See* HHS Cybersecurity Program HC3: Analyst Note (April 18, 2022), www.hhs.gov/sites/default/files/hive-ransomware-analyst-note-tlpwhite.pdf (last visited June 20, 2025).

**CLASS ACTION COMPLAINT**

applicable. Keep computers, devices, and applications patched and up-to-date.

- Install and regularly update anti-virus or anti-malware software on all hosts.[21]

It appears based on the amount of time this attack went unnoticed that Defendants failed and refused to adopt these recommended mitigations.

54.    As another HHS Analysis points out: "When defending against Hive or any other ransomware variant, there are standard practices that should be followed. Prevention is always the optimal approach. This includes but is not limited to the following: Use two-factor authentication with strong passwords – this is especially applicable for remote access services such as RDP and VPNs."

(a)    Sufficiently backing up data, especially the most critical, sensitive and operationally necessary data is very important. We recommend the 3-2-1 Rule for the most important data: Back this data up in three different locations, on at least two different forms of media, with one of them stored offline.

(b)    Continuous monitoring is critical, and should be supported by a constant input of threat data (open source and possibly proprietary as well)

(c)    An active vulnerability management program must be comprehensive in scope and timely in implementation of the latest software updates. It should apply to traditional information technology infrastructure as well as any medical devices or equipment that is network-connected.

(d)    Endpoint security should be comprehensive in scope and updated

---

[21]*Id.* at 7-8. The August Alert also contains links to additional resources to prevent, protect against, and respond to ransomware events.

13

**CLASS ACTION COMPLAINT**

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

with the latest signatures/updates aggressively.[22]

55.    Despite numerous attempts by the federal government to inform healthcare and insurance organizations like Defendants of the threat posed by such attacks, and despite Defendants' having more than three years to prepare and prevent such an attack based on the recommendations provided in these and other notices, Defendants were negligent, reckless, or intentionally tortious in their failure to take steps to adequately prepare for this wholly foreseeable event. It appears that Defendants did not have multi-factor authentication in place with the requirement of strong passwords; did not sufficiently arrange for back up data to be stored in a safe location that could be quickly brought back on line; did not engage in continuous system monitoring or otherwise set up a system that would identify and prevent access from an increase in unauthorized account access, did not acquire or implement an active vulnerability management program or comprehensive endpoint security measures that would have detected that hackers had gained access to Defendants' computer systems for three weeks without being detected.

## B.    Defendants Knew or Should Have Known of the Risk Because Healthcare Entities In Possession Of Private Information Are Particularly Suspectable To Cyber Attacks

56.    Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare companies that collect and store Private Information, like Defendants, preceding the date of the Data Breach.

57.    Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread. In light of the many recent high profile cybersecurity incidents at other healthcare partner and

---

[22] HHS Cybersecurity Program HC3: Analyst Note, *supra* (emphasis added).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023), Defendants knew or should have known that their electronic records would be targeted by cybercriminals. Defendants knew and understood unprotected or exposed Private Information in the custody of healthcare entities, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

58. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

59. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

60. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

61. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly PHI—fraudulent use of that information and damage to victims may continue for years.

62. As healthcare entities in custody of their current and former patients' Private Information, Defendants knew, or should have known, the importance of

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

safeguarding Private Information entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a data breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

## C.    Data Breaches are Preventable

63.    Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise Private Information, Defendants' approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the Private Information Defendants were maintaining and transferring for Plaintiff and Class Members such as encrypting the information or deleting it when it is no longer needed, and this caused the exposure of that Private Information.

64.    As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[23]

65.    Defendants could have prevented this Data Breach. Defendants could have and should have implemented measures—as recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, implementing the following recommendations:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- **Enable strong spam filters** to prevent phishing emails from

---

[23] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited June 19, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[24]

66.    To prevent and detect cyberattacks and ransomware attacks, Defendants could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**

    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audits
    - remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise

---

[24] *Id.*

- **Include IT Pros in security discussions**

  - Ensure collaboration among security operations, security admins, and information technology admins to configure servers and other endpoints securely

- **Build credential hygiene**

  - Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications.[25]

67.    Similarly, Defendants could and should have implemented measures—as also recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers.

- Keep only what you need for your business.

- Protect the information that you keep. Properly dispose of information you no longer need. Create a plan to respond to

---

[25] *See* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited June 19, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    security incidents.[26]

2    68.    Finally, Defendants could and should have implemented the following

3    measures—as also recommended by the United States Government—to prevent and

4    detect cyberattacks and/or ransomware attacks, including the following

5    recommendations:

6    • **Conduct regular vulnerability scanning to identify and**

7        **address vulnerabilities**, especially those on internet-facing

8        devices, to limit the attack surface.

9    • **Regularly patch and update software and operating systems**

10        **to the latest available versions.** Prioritize timely patching of

11        internet-facing servers that operate software for processing

12        internet data such as web browsers, browser plugins, and

13        document readers-especially for known exploited

14        vulnerabilities….

15    • **Limit the use of RDP and other remote desktop services.** If

16        RDP is necessary, apply best practices. Threat actors often gain

17        initial access to a network through exposed and poorly secured

18        remote services, and later traverse the network using the native

19        Windows RDP client.

20    • **Ensure all on-premises, cloud services, mobile, and personal**

21        **devices are properly configured, and security features are**

22        **enabled**. For example, disable ports and protocols that are not

23        being used for business purposes.[27]

24    69.    Given that Defendants were collecting, storing, and transferring highly

25

26    [26] *See* https://www.ftc.gov/business-guidance/resources/protecting-personal-
information-guide-business (last visited June 19, 2025).

27    [27] *See* https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last
visited June 19, 2025).

28

1   sensitive Private Information belonging to Plaintiff and Class Members, Defendants
2   could and should have implemented all the above measures to prevent and detect
3   cyberattacks.

4        70.    The occurrence of the Data Breach indicates that Defendants failed to
5   adequately implement one or more of the above measures to prevent cyberattacks or
6   ransomware attacks, resulting in the Data Breach and data thieves accessing and
7   acquiring the Private Information of Plaintiff and hundreds of thousands of Class
8   Members.

9        **D.    Defendants Acquire, Collect, and Store Plaintiff's and Class**
10                **Members' Private Information**

11       71.    Defendants acquire, collect, and store a significant amount of Private
12  Information belonging to Class Members.

13       72.    As a condition of receiving treatment and medical services from Sharp,
14  Plaintiff and Class Members were required to entrust their highly sensitive Private
15  Information to Sharp, and in turn either directly or indirectly to Defendant Episource.

16       73.    By obtaining, collecting, and using Plaintiff's and Class Members'
17  Private Information, Defendants assumed legal and equitable duties and knew or
18  should have known that they were responsible for protecting Plaintiff's and Class
19  Members' Private Information from disclosure.

20       74.    Plaintiff and Class Members have taken reasonable steps to maintain the
21  confidentiality of their Private Information and would not have entrusted it to
22  Defendants absent a commitment to safeguard that information.

23       75.    Upon information and belief, while collecting Private Information from
24  Plaintiff and Class Members, Defendants promised to provide confidentiality and
25  adequate security for their data through their applicable privacy policies and through
26  other disclosures in compliance with statutory privacy requirements.

27       76.    Plaintiff and Class Members relied on Defendants to keep their Private
28  Information confidential and securely maintained, to use this information for business

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

purposes only, and to make only authorized disclosures of this information. The Data Breach occurred because Defendants failed to do so.

### E.    Defendants Violated Their Statutory and Regulatory Obligations to Protect Plaintiff's and Class Members' Data.

77.    Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information entrusted to them and of the foreseeable consequences of a breach of the security of their computer networks. Defendants were on notice that they should have and could have prevented this Data Breach by properly securing and encrypting the Private Information of Plaintiff and the Class Members and taking the steps outlined above to prevent infiltration by methods such as phishing, for example, by using multi-factor authentication methods. Defendants could also have destroyed data of certain former enrollees that were no longer needed, especially outdated data.

78.    Thus, Defendants failed to take appropriate preventive actions to protect Plaintiff's and Class Members' Private Information or records against release consistent with their obligations, as covered entities, under both the laws set forth herein and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.102, and all HIPAA Administrative Simplification Regulations in effect on January 1, 2012, contained in Parts 160, 162, and 164 of Title 45 of the Code of Federal Regulations, and Part 2 of Title 42 of the Code of Federal Regulations, including, but not limited to: (a) Developing and implementing security policies and procedures; and (b) Encrypting the information or records, and protecting against the release or use of the encryption key and passwords, or transmitting the information or records in a manner designed to provide equal or greater protections against improper disclosures.

79.    Because Defendants are entities covered by HIPAA, they are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health

Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendants' protection of Private Information maintained by them in electronic form.

80.    HIPAA requires Defendants to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is defined as "individually identifiable health information... that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

81.    HIPAA's Security Rule requires Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by their workforce.

82.    HIPAA also requires Defendants to "review and modify the security measures implemented...as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

83.    The Data Breach clearly meets the HIPAA Security Rule's definition of a "reasonably anticipated" threat or hazard to the security or integrity of Plaintiff's and Class Members' Protected Information. Similar cyberattacks have become so notorious that the FBI and U.S. Secret Service in 2019 issued a warning to potential

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

targets like Defendants so that they would become aware of a potential attack and prepare themselves to comply with their statutory and regulatory obligations. According to the cybersecurity firm Mimecast, 90% of healthcare organizations had experienced cyberattacks in the year of the FBI's report.[28]

84.    The healthcare industry, in particular, experienced a large number of high-profile cyberattacks, placing Defendants on notice of the need to ensure their systems were not vulnerable to attacks like that suffered here. Cybersecurity breaches hit an all-time high in 2023, exposing a record amount of patient PHI. In 2023, 106 million individuals were affected by healthcare attacks, up from 44 million people in 2022.[29]

85.    Due to the high-profile nature of these data breaches, Defendants either were or reasonably should have been on heightened notice of the threat of attacks occurring in the healthcare industry and, therefore, should have been on notice of their statutory and regulatory duties to protect against such attacks by diligently overseeing, preparing for, and immediately responding to such an attack. By the time of this Data Breach, Defendants should have been aware that ransomware attacks were on the upswing: "In 2022 [cyber-security firm Blackfog] recorded a total of 376 attacks, a 29% increase over 2021 and 34% increase from 2020. Key take aways from these overall numbers is that 89% of all attacks now involve data exfiltration, 9% more than in 2021. From a tactical point of view we also saw an increase in the use of

---

[28] *See* Mimecast Research: 90 Percent of Healthcare Organizations Hit with an Email-Borne Attack in the Past Year, Nasdaq (Mar. 10, 2020) https://www.nasdaq.com/press-release/mimecast-research:-90-percent-of-healthcare-organizations-hit-with-an-email-borne (last visited June 20, 2025).

[29] *Healthcare cyberattacks have affected more than 100 million people in 2023*, December 18, 2023, https://www.chiefhealthcareexecutive.com/view/health-data-cyberattacks-have-affected-more-than-100-million-people-in-2023 (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PowerShell, now at 87% of all attacks, a 7% increase from 2021 . . . . the Dark Web was used in 23% of all attacks, a dramatic increase from 5% in 2021."[30]

86.    Despite the prevalence of public announcements alerting Defendants of the risks presented to Plaintiff and Class Members, Defendants failed to take appropriate steps to comply with their statutory and regulatory duties to protect Plaintiff's and Class Members' Private Information.

87.    The attack on Defendants clearly establishes that they did not comply with HIPAA Rules. This attack resulted from a combination of insufficiencies that demonstrate Defendants failed to implement safeguards mandated by HIPAA regulations, including, but not limited to, the following:

(a)    Failing to ensure the confidentiality and integrity of electronic PHI that Defendants create, receive, maintain, and transmit, in violation of 45 C.F.R. section 164.306(a)(1);

(b)    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights such as by the use of multi factor authentication, in violation of 45 C.F.R. section 164.312(a)(1);

(c)    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

(d)    Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

(e)    Failing to protect against any reasonably-anticipated threats or

---

[30] BlackFog, 2022 Ransomware Attack Report, January 20, 2023,
www.blackfog.com/2022-ransomware-attack-report/ (last visited June 20, 2025)

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

(f)    Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

(g)    Failing to ensure compliance with HIPAA security standard rules by its workforce by providing for adequate comprehensive training rather than simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. section 164.306(a)(4);

(h)    Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, *et seq.*;

(i)    Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI beyond simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

(j)    Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

88.    Defendants also violated their duties under the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq*. ("FTCA"). Pursuant to the FTCA and regulations promulgated thereunder, the Federal trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

security for consumers' sensitive personal information is an "unfair practice" that violates the FTCA.

89.    According to the FTC, the need for data security should be factored into all business decision-making.[31] To that end, the FTC has issued numerous guidelines identifying data-security practices that businesses, such as Defendants, should employ to protect against the unlawful exfiltration of Private Information.

90.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[32] The guidelines explain that businesses should:

(a)    protect the personal customer information that they keep;

(b)    properly dispose of personal information that is no longer needed;

(c)    encrypt information stored on computer networks;

(d)    understand their network's vulnerabilities; and,

(e)    implement policies to correct security problems.

91.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

92.    The FTC recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[33]

---

[31] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015), bit.ly/3uSoYWF (last visited June 20, 2025).
[32] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), bit.ly/3u9mzre (last visited June 20, 2025).
[33] *See Start with Security*, *supra*.

93.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

94.    These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

95.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to member Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

96.    The applicable FTC rules, regulations, and guidelines obligated businesses like Defendants to protect Private Information from unauthorized access or disclosure by unauthorized persons.

97.    At all relevant times, Defendants were fully aware of their obligation to protect their enrollees' Private Information because they are sophisticated business entities in the business of maintaining and transmitting Private Information.

98.    Defendants were also aware of the significant consequences of their failure to protect Private Information for the millions of enrollees who provided their Private Information to Defendants, and knew that this data, if hacked, would injure Plaintiff and Class Members.

99.    Defendants failed to comply with applicable FTC rules, regulations and guidelines, and industry standards concerning the protection and security of Private Information. As evidenced by the duration, scope, and nature of the Data Breach,

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

among its many deficient practices, Defendants failed in, inter alia, the following respects:

> (a)    Developing and employing adequate intrusion detection systems;
>
> (b)    Engaging in regular reviews of audit logs and authentication records;
>
> (c)    Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;
>
> (d)    Ensuring the confidentiality and integrity of current and former subscribers' Private Information that Defendants receive and maintain;
>
> (e)    Protecting against any reasonably anticipated threats or hazards to the security or integrity of their current and former subscribers' Private Information;
>
> (f)    Implementing policies and procedures to prevent, detect, contain, and correct security violations;
>
> (g)    Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;
>
> (h)    Implementing technical policies, procedures and safeguards for electronically stored information concerning Private Information that permit access for only those persons or programs that have specifically been granted access; and
>
> (i)    Other similar measures to protect the security and confidentiality of its current and former enrollees' Private Information.

100.    Had Defendants implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. Defendants could have prevented or detected the Data Breach prior to the hackers accessing Defendants' systems and extracting

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Private Information for three weeks; the amount and/or types of Private Information accessed by the hackers could have been avoided or greatly reduced; and Plaintiff and Class Members would have been notified sooner, allowing them to promptly take protective and mitigating actions.

101. As established by these laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants also owed a duty to Plaintiff and Class Members to provide reasonable security in compliance with industry standards and state and federal requirements, and to ensure that their computer systems, networks, and protocols adequately protected this Private Information and were not exposed to infiltration. This also included a duty to Plaintiff and Class Members to design, maintain, and test their computer systems to ensure that the Private Information in their possession was adequately secured and protected; to create and implement reasonable data security practices and procedures to protect the Private Information in their possession and avoid access to their systems through processes such as phishing, including adequately training employees and others who accessed information within their systems on how to adequately protect Private Information; to avoid permitting such infiltration such as by use of multi-factor authentication; to implement processes that would detect a breach of their data security systems in a timely manner and to act upon data security warnings and alerts in a timely fashion; to promptly and fully disclose if their computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft or exfiltration; and to disclose in a timely and accurate manner when data breaches or cyber-attacks occurred.

102. Defendants owed these duties to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices. Defendants affirmatively chose to design their systems with inadequate user

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    authentication, security protocols and privileges, and set up faulty patching and
2    updating protocols and backup systems. These affirmative decisions resulted in
3    unauthorized parties being able to execute this Data Breach and exfiltrate the data in
4    question, to the injury and detriment of Plaintiff and Class Members. By taking
5    affirmative acts inconsistent with these obligations that left Defendants' computer
6    systems vulnerable to such an attack, Defendants disclosed and permitted the
7    disclosure of Private Information of Plaintiff and Class Members to unauthorized
8    third parties. Through such actions or inactions, Defendants failed to preserve the
9    confidentiality of Private Information they were duty-bound to protect.

10       103.   Defendants represented that they cared about data security and the
11   safeguarding of Plaintiff's and Class Members' Private Information, and they
12   represented that they would keep secure and confidential the Private Information
13   belonging to Plaintiff and Class Members.

14       104.   Plaintiff's and Class Members' Private Information was provided to
15   Defendants in reasonable understanding of their promises and self-imposed
16   obligations to keep Private Information confidential, and to secure the Private
17   Information from unauthorized access by malevolent actors. Defendants failed to do
18   so.

19       105.   The duration of the Data Breach, the amount of time it went undetected,
20   and the years of information impacted also demonstrate that Defendants failed to
21   adequately safeguard Private Information by, *inter alia,* maintaining an adequate data
22   security environment to reduce the risk of a data breach; periodically auditing their
23   security systems to discover intrusions like the Data Breach; deleting outdated
24   information to protect against unnecessary risks of exposure; and retaining outside
25   vendors to periodically test their network, servers, systems and workstations.

26       106.   Had Defendants undertaken the actions that federal and state law require,
27   the Data Breach could have been prevented or the consequences of the Data Breach
28   significantly reduced, as Defendants would have detected the Data Breach prior to the

hackers extracting Private Information from Defendants' networks, and Defendants' patients and customers would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating measures much earlier.

### F.    Value of Private Information

107.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[34] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[35]

108.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[36]

109.    As the FTC has warned, the theft of PHI is also gravely serious because "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[37]

110.    The greater efficiency of electronic health records brings increased risk of data breaches because cybercriminals recognize these records contain a significant trove of sensitive information (e.g., patient data, patient diagnosis, lab results,

---

[34] 17 C.F.R. § 248.201 (2013).

[35] *Id.*

[36] *See* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 19, 2025).

[37] https://www.usatoday.com/story/money/personalfinance/2015/03/28/the-new-kind-of-identity-theft-you-havent-heard-of/25091257/ (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

medications, prescriptions, treatment plans, etc.). A single patient's complete record can be sold for hundreds of dollars on the dark web.

111.   Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[38] During 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[39] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[40]

112.   "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[41]

113.   A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[42] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve

[38] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last visited June 20, 2025).
[39] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited June 20, 2025).
[40] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last visited June 20, 2025).
[41] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited June 20, 2025).
[42] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

their identity theft at all.[43]

114.  This data, as one would expect, demands a much higher price on the black market than financial data alone. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[44]

115.  The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, Social Security numbers, or other government issued identification numbers.

116.  Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

117.  The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches

---

[43] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last visited June 20, 2025).

[44] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-credit-card-numbers.html (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    cannot necessarily rule out all future harm.[45]

2    118.   Plaintiff and Class Members now face years of constant surveillance of
3  their financial and personal records, monitoring, and loss of rights. The Class is
4  incurring and will continue to incur such damages in addition to any fraudulent use
5  of their Private Information.

6    **G.    Industry Standards Specific to Cloud Data Storage**

7    119.   In addition to the general data security standards described above,
8  numerous authorities have issued guidance specific to cloud data storage, defining the
9  roles and responsibilities of cloud service providers (like Episource) and customers
10  (like Sharp).

11    **1.    Governmental Authorities**

12    120.   In June 2020, the FTC published an article titled, *Six steps toward more*
13  *secure cloud computing.* The article warned, "[a]s cloud computing has become
14  business as usual for many businesses, frequent news reports about data breaches and
15  other missteps should make companies think carefully about how they secure their
16  data." The article expressly highlighted the importance of MFA in protecting
17  consumer data stored on cloud services, recommending businesses: "Require multi-
18  factor authentication and strong passwords to protect against the risk of unauthorized
19  access."[46]

20    121.   In March 2023, the FTC issued a Request for Information seeking public
21  comment on "Business Practices of Cloud Computing Providers that Could Impact
22  Competition and Data Security."[47] After reviewing over 100 public comments on the
23  issue, the FTC published a report in November 2023 titled, *Cloud Computing RFI:*
24

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

25  [45] *See* https://www.gao.gov/assets/gao-07-737.pdf (last visited June 19, 2025).
26  [46] https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-
     secure-cloud-computing (last visited June 19, 2025).
27  [47] https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-
     comment-business-practices-cloud-computing-providers-could-impact-competition-
28  data (last visited June 19, 2025).

*What we heard and learned.* The report expressly flagged the room for improvement in cloud security as follows: "[A] a number of commenters argued there is a great deal of room for improvement in cloud security; that default security configurations could be better; and that the "shared responsibility" model for cloud security often lacks clarity, which can lead to situations where neither the cloud provider nor the cloud customer implements necessary safeguards."[48]

122.    In March 2024, the U.S. National Security Agency and Cybersecurity & Infrastructure Agency issued a joint publication titled, *Use Secure Cloud Identity and Access Management Practices.* The publication warned, "[a]s organizations continue to migrate to using cloud environments, these environments are becoming increasingly valuable targets for malicious cyber actors[.]" The publication made numerous recommendations relevant to MFA, rotating credentials, and restricting allow lists to ensure only necessary privileges are granted to users:

- **Multifactor authentication.** Single-factor authentication (e.g., password or PIN only) based account access is susceptible to credential theft, forgery, and reuse across multiple systems. Cloud accounts are generally globally accessible; thus they are more susceptible to certain types of single-factor authentication weaknesses. Multifactor authentication (MFA) boosts account security, better resisting compromise by enhancing user verification methods. MFA requires two or more factors for login: something the user knows, has, or is. Typically this is implemented using a password and a second factor usually based on a randomly seeded numeric token, a biometric option (such as a fingerprint or facial recognition), or a physical token (unique hardware-based identifier: smartcard, Common Access Card,

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

---

[48] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/11/cloud-computing-rfi-what-we-heard-learned (last visited June 19, 2025).

etc.).

- Periodically audit IAM configurations to confirm only necessary privileges are granted to users. Many CSPs [Cloud Service Providers] offer services that will track unused privileges to help admins tailor accounts to the least privileges users need to accomplish their day-to-day responsibilities.

123.    Also in March 2024, NSA separately issued a publication titled, *NSA's Top Ten Cloud Security Mitigation Strategies.* The publication emphasized the importance of MFA, credential rotation, and restricted allow lists as follows for customers using cloud data services as follows:[49]

> Proper identity and access management (IAM) are critical to securing cloud resources. Malicious actors can compromise accounts using phishing techniques, exposed credentials, or weak authentication practices to gain initial access into cloud tenants. They can also exploit overly broad access control policies to penetrate further into the environment, gaining access to sensitive resources. To prevent this, cloud users should use secure authentication methods such as phishing-resistant multifactor authentication (MFA) and properly managed temporary credentials. Access control policies should be carefully configured to ensure users are granted the least privileges necessary. Separation of duties should be implemented to protect especially sensitive operations and resources.

## 2.    <u>Industry Standards</u>

124.    The PCI Data Security Council has issued an April 2018 supplement to the PCI DSS titled, *Cloud Computing Guidelines.*[50] The PCI Cloud Computing Guidelines again emphasize the importance of MFA, providing: "PCI DSS Requirement 8.2.2 requires multi-factor authentication for all remote network access to the CDE [cardholder data environment], and when public cloud services are part of

---

[49] https://media.defense.gov/2024/Mar/07/2003407860/-1/-1/0/CSI-CloudTop10-Mitigation-Strategies.PDF (last visited June 19, 2025).

[50] https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited June 19, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

a Customer's CDE, all such access will be considered remote access and will require multi-factor authentication.

125.    The PCI Cloud Computing Guidelines includes a section titled *Intrusion Detection Systems (IDS) / Intrusion Prevention Systems (IPS)*, which provides: "As the Customer's access to network level data can be severely restricted in cloud environments, the responsibility for tracking intrusions at the network layer will often reside with the Provider, as the only entity that has sufficient privileges to do this across the underlying infrastructure." The guidelines go on to note that for SaaS providers such as Episource: "Since customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[51]

126.    The Center for Internet Security ("CIS") is a non-profit organization that develops globally recognized best practices for securing IT systems and data. In March 2022, CIS issued a publication entitled *CIS Controls Cloud Companion Guide* that provided guidance as on security best practices for customers using cloud services. The guidance made the following recommendations emphasizing the importance of MFA and revoking access to stale credentials:

- **Disable Dormant Accounts.** Delete or disable any dormant accounts after a period of 45 days of inactivity, where supported.

- **Establish an Access Revoking Process.** Establish and follow a process, preferably automated, for revoking access to enterprise assets, through disabling accounts immediately upon termination, rights revocation, or role change of a user. Disabling accounts, instead of deleting accounts, may be necessary to preserve audit trails.

- **Require MFA for Administrative Access.** Require MFA for all administrative access accounts, where supported, on all enterprise

---

[51] https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf (last visited June 19, 2025).

**CLASS ACTION COMPLAINT**

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    assets, whether managed on-site or through a third-party provider.

2    127.    ISO/IEC 27017 is an international standard that "provides controls and

3    implementation guidance for both cloud service providers and cloud service

4    customers."[52] Control 9.2.3 specifically highlights that cloud service customers (like

5    Sharp) should use MFA and cloud service providers (like Episource) should provide

6    MFA capabilities as follows:

| Cloud service customer | Cloud service provider |
|---|---|
| The cloud service customer should use sufficient authentication techniques (e.g., multi-factor authentication) for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service according to the identified risks. | The cloud service provider should provide sufficient authentication techniques for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service, according to the identified risks. For example, the cloud service provider can provide multi-factor authentication capabilities or enable the use of third-party multi-factor authentication mechanisms. |

**H.    Defendants Each Owed a Duty of Care to Plaintiff and Class Members.**

128.    The Private Information of Plaintiff and Class Members was stored on Defendants' platforms, networks, systems or products at the time of the Data Breach.

129.    Defendants owed common law duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Defendants' possession from being compromised, accessed, stolen, or misused by unauthorized parties.

/ / /

/ / /

[52] https://www.amnafzar.net/files/1/ISO%2027000/ISO%20IEC%2027017-2015.pdf (last visited June 19, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1.   **Defendant Episource Breached its Duty of Care to Plaintiff
and Class Members**

130.   Defendant Episource's duty of reasonable care is established due to the nature of its business, which is to provide *secure* medical coding and risk adjustment services via its proprietary Platform software to customers, and store massive amounts of data, including Plaintiff's and Class Members' Private Information. In offering and undertaking these services to customers, Episource had a duty to exercise reasonable care to safeguard Plaintiff's and Class Members' Private Information because it was foreseeable that failure to do so would cause them injury.

131.   Episource's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard the Private Information it stored.

132.   Episource's duty of reasonable care is also established by its own marketing statements and Privacy Policy, which boast its secure provision of services.

133.   Episource's duty of reasonable care is also established by relevant common law.

134.   Episource breached its duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information by failing to implement adequate data security practices, which caused the Data Breach.

135.   Episource was negligent and breached its duty of care to Plaintiff and Class Members to protect their Private Information from exploitation via customers' use of the Platform.

136.   Episource's breach of its duty of care caused the Data Breach, because if Episource had maintained adequate data security, the Data Breach could have been prevented.

137.   Episource's data security failings also constitute an unfair trade practice.

As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of Private Information violates the FTCA's prohibition on "unfair and deceptive acts."

138.    Episource's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiff and Class Members.

139.    Episource is liable for the injuries suffered by Plaintiff and Class Members by virtue of its role as the proprietary owner and administrator of the Platform, which was used to facilitate the transfer of and store the Private Information of its affected customers, including Defendant Sharp.

## 2.    Defendant Sharp Breached its Duty of Care to Plaintiff and Class Members

140.    At the time of the Data Breach, Sharp failed to maintain reasonable data security measures and comply with FTC guidance and other relevant industry standards. These data security failings included: Sharp's failure to adequately oversee or select third party vendors to which it entrusted the Private Information of its patients.

141.    Sharp's data security failings enabled the Data Breach. Without these basic protections, cybercriminals were able to exfiltrate the Private Information of Plaintiff and Class Members.

142.    Sharp, through these basic data security failings, breached its express representations in its Privacy Policy, detailed earlier in the complaint.

143.    In the alternative, Sharp breached implied commitments to protect the Private Information of patients, including Plaintiff and Class Members, by virtue of mandating that patients provide their sensitive Private Information as a condition of receiving medical treatment and services from Sharp.

144.    Sharp's basic data security failings also constitute a breach of its duty of care to protect the Private Information of patients, which include Plaintiff and Class Members.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

### 3.    Plaintiff and Class Members have suffered injuries as a Result of the Data Breach.

145.   Plaintiff and Class Members have suffered the following forms of injury as a result of the Data Breach.

146.   The Data Breach's disclosure of Plaintiff's and Class Members' Private Information has created a substantial risk that their data will be misused. This risk is demonstrated by the fact that cybercriminals now control that data.

147.   The Ponemon Institute found that "health care identity theft victims spend nearly $13,500" to resolve complications and that victims often have to pay the imposter's fraudulent medical bills. In another study by the Ponemon Institute in 2015, 31% of medical identity theft victims lost their healthcare coverage as a result of the incident, while 29% had to pay to restore their health coverage, and over half were unable to resolve the identity theft at all.

148.   As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost here.

149.   Due to the actual and imminent risk of identity theft, Episource's posted notice encourages Plaintiff and Class Members to do the following:

> Individuals should be on the lookout and regularly monitor the explanation of benefits statements received from their health plan and statements from health care providers, as well as bank and credit card statements, credit reports, and tax returns, to check for any unfamiliar activity.

If individuals notice any health care services they did not receive listed on an explanation of benefits statement, they should contact their health plan or doctor.

If individuals notice any suspicious activity on bank or credit card statements or on tax returns, they should immediately contact their financial institution and/or credit card company or relevant agency.
If an individual believes they are the victim of a crime, they can contact local law enforcement authorities and file a police report.[53]

150.   Due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Episource encourages, monitor their medical statements and financial accounts for many years to mitigate the risk of identity theft.

151.   Plaintiff and Class Members have spent, and will continue to spend, additional time in the future, on prudent actions, such as researching and verifying the legitimacy of the Data Breach upon receiving notice, changing passwords and resecuring their own computer networks; and contacting companies regarding suspicious activity on their accounts.

152.   Plaintiff's and Class Members' mitigation efforts are consistent with the U.S. Government Accountability Office's 2007 report regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[54]

153.   Plaintiff's and Class Members' mitigation efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their Private information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to

---

[53] https://response.idx.us/episource/ (last visited June 19, 2025).

[54] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    remove fraudulent charges from their accounts, placing a credit freeze on their credit,

2    and correcting their credit reports.[55]

3    154.   Plaintiff and Class Members also suffered lost property value in their

4    Private Information when Defendants allowed their Private Information to fall into

5    the hands of cybercriminals, which will freely sell or distribute their Private

6    Information at any time.

7    155.   PII and PHI are valuable property rights.[56] Their value is axiomatic,

8    considering the value of Big Data in corporate America and the consequences of cyber

9    thefts include heavy prison sentences. Even this obvious risk to reward analysis

10   illustrates beyond doubt that Private Information has considerable market value.

11   156.   An active and robust legitimate marketplace for PII and PHI exists. In

12   2019, the data brokering industry was worth roughly $200 billion.[57]

13   157.   In fact, the data marketplace is so sophisticated that consumers can

14   actually sell their non-public information directly to a data broker who in turn

15   aggregates the information and provides it to marketers or app developers.[58,59]

16   158.   Consumers who agree to provide their web browsing history to the

17   Nielsen Corporation can receive up to $50 a year.[60]

18   159.   Conversely sensitive PII can sell for as much as $363 per record on the

19   _____

20   [55] *See* Federal Trade Commission, *Identity Theft.gov*,
     https://www.identitytheft.gov/Steps (last visited Jun 20, 2025).

21   [56] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of

22   Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,
     15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost,

23   has quantifiable value that is rapidly reaching a level comparable to the value of
     traditional financial assets.") (citations omitted).

24   [57] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last

25   visited June 20, 2025).

26   [58] https://datacoup.com/ (last visited June 20, 2025).
     [59] https://digi.me/what-is-digime/ (last visited June 20, 2025).

27   [60] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at

28   https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last  visited June 20,
     2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

dark web according to the Infosec Institute.[61]

160.   According to Experian, one of the three major credit bureaus, medical records can be worth up to $1,000 per person on the dark web, depending upon completeness.

161.   A robust cyber black market exists in which criminals post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web, to create fake insurance claims, purchase and resell medical equipment, or access prescriptions for illegal use or resale. Criminals often trade stolen Private Information on the "cyber black market" for years following a breach. For example, it is believed that certain Private Information compromised in the 2017 Experian data breach was being used three years later by identity thieves to apply for COVID-19-related benefits.[62] According to a 2017 Javelin strategy and research presentation, fraudulent activities using data stolen in data breaches between two and six years old had increased by nearly 400% over the previous 4 years.[63]

162.   As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the

---

[61] See Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited June 20, 2025).

[62] Janelle Stecklein, *Director: 64,000-plus fraudulent unemployment claims 'mitigated'*, The Duncan Banner (June 24, 2020), https://www.duncanbanner.com/news/director-64-000-plus-fraudulent-unemployment-claims-mitigated/article_dc446671-73a6-5e8a-b732-bcedba72b458.html (last visited June 20, 2025).

[63] *See*, Brian Stack, Here's How Much Your Personal Information is Selling for on the Dark Web (2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 20, 2025).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION COMPLAINT**

Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

163.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

164.    Sharp breached its express and implied contractual commitments to Plaintiff and Class Members to protect their Private Information.

165.    The breach of a contractual obligation constitutes an injury to Plaintiff and Class Members and provides a basis for a lawsuit to enforce the terms of the contract.

166.    In breaching their contractual commitments, Sharp further injured Plaintiff and Class Members by depriving them of the benefit-of-the-bargain they had reached.

167.    For example, Plaintiff and Class Members entered into agreements with Sharp based on express and implied representations that their Private Information would be protected—which was factored into the value of that exchange. As Sharp failed to maintain reasonable data security measures to protect that Private Information, it deprived Plaintiff and Class Members of the benefit-of-the-bargain where they were owed the value of reasonable data security measures that were not provided.

168.    Plaintiff and Class Members have also been injured by an invasion of their privacy rights. The disclosure of their Private Information to cybercriminals involves Private Information whose private nature was compromised by the Data Breach.

169.    In addition, Plaintiff and Class Members have suffered emotional distress and anxiety resulting from the Data Breach and fear of the substantial risk of identity theft and loss of privacy. Plaintiff and Class Members understand that their Private Information cannot now be clawed back from the dark web.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

### 4.   **Plaintiff McFall's Individual experience**

170.   Plaintiff McFall is a patient of Defendant Sharp.

171.   As a condition of obtaining treatment and services from Sharp, Plaintiff was required to provide her Private Information to Sharp.

172.   Upon information and belief Plaintiff's Private Information was stolen from Defendants' systems, networks, and/or software in the Data Breach.

173.   Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach.

174.   Because of the Data Breach, Plaintiff McFall's confidential Private Information is in the hands of cybercriminals. As such, Plaintiff McFall and other Class Members are at imminent risk of identity theft and fraud.

175.   As a result of the Data Breach, Plaintiff McFall has and will expend hours of her time and loss of productivity addressing and attempting to ameliorate, and mitigate, the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft in order to prevent, *inter alia*, having medical services and products billed in her name, loans opened in her name, tax returns filed in her name, utility bills opened in her name, credit card accounts opened in her name.

176.   Plaintiff McFall places significant value on the security of her Private Information and does not readily disclose it. Plaintiff McFall has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff McFall would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

177.   Plaintiff McFall has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach.

178.   Plaintiff McFall has a continuing interest in ensuring that her Private

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and Class Members' Private Information will be wholly unprotected and at-risk of future data breaches.

179.    Plaintiff suffered actual injury as a result of the unauthorized access and disclosure of her Private Information in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her Private Information; (iii) lost or diminished value of her Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect her Private Information.

180.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not informed Plaintiff of key details about the Data Breach's occurrence.

## IX.    CLASS ACTION ALLEGATIONS

181.    Plaintiff brings this action on her own behalf, and on behalf of the following "Class":

> All individuals residing in the United States whose Private Information was identified as compromised in the Data Breach.

182.    Excluded from the Class are Defendants' officers, directors, employees, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

183.    Plaintiff reserves the right to amend or modify the definition of the Class

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

48

**CLASS ACTION COMPLAINT**

1  or create subclasses as this case progresses.

2      184.  **Numerosity.** The members of the Class are so numerous that joinder of

3  all of them is impracticable. Episource's filings with the U.S. government indicates

4  that there are over 5.4 million individuals whose data was implicated in the Data

5  Breach.

6      185.  **Commonality.** There are questions of fact and law common to the Class,

7  which predominate over individualized questions. These common questions of law

8  and fact include, but are not limited to:

9          (a)  Whether Episource and Sharp had a duty to protect the Private

10             Information of Plaintiff and Class Members, and whether they

11             breached that duty.

12          (b)  Whether Episource and Sharp knew or should have known that

13             their data security practices were deficient.

14          (c)  Whether Episource's and Sharp's data security systems were

15             consistent with industry standards prior to the Data Breach.

16          (d)  Whether Plaintiff and Class Members are entitled to actual

17             damages, punitive damages, treble damages, statutory damages,

18             nominal damages, and/or injunctive relief.

19      186.  **Typicality.** Plaintiff's claims are typical of those of other Class Members

20  because Plaintiff's Private Information, like that of every other Class Member, was

21  compromised in the Data Breach.

22      187.  **Adequacy of Representation.** Plaintiff will fairly and adequately

23  represent and protect the interests of the Class Members. Plaintiff's Counsel are

24  competent and experienced in litigating class actions.

25      188.  **Predominance.** Episource and Sharp engaged in a common course of

26  conduct toward Plaintiff and Class Members, in that their data was stored on the same

27  Episource software and products and were unlawfully accessed in the same manner.

28  The common issues arising from Episource's and Sharp's conduct affecting Class

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

49
**CLASS ACTION COMPLAINT**

Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

189.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Class. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Episource and Sharp. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

190.   Defendants have acted on grounds that apply generally to the Class as a whole such that injunctive relief, and declaratory relief are appropriate on a classwide basis.

191.   Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their Private Information.
- Whether Defendants' data security measures were inadequate in light of applicable regulations and industry standards.
- Whether Defendants' data security measures were negligent.

192.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and contact information of Class Members affected by the Data Breach.

/ / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

# X.    CAUSES OF ACTION

## Count I

### Negligence (On behalf of the Plaintiff and the Class)

193.    Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

194.    Defendants required Plaintiff and Class Members to submit non-public Private Information as a condition of obtaining medical treatment and services from Defendants.

195.    Plaintiff and Class Members entrusted their Private Information to Defendants with the understanding that Defendants would safeguard their Private Information and delete it once the relationship terminated.

196.    By assuming the responsibility to collect and store this Private Information, and in fact doing so, and sharing it and using it for commercial gain, Episource and Sharp owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their Private Information in their possession from being compromised, stolen, or misused by unauthorized persons, and to secure and safeguard their computer property. Defendants' duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the event of a data breach.

197.    Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the Private Information of Plaintiff and Class Members; (b) maintaining, testing, and monitoring Defendants' security systems to ensure that Private Information was adequately secured and protected; (c) implementing intrusion detection systems and timely notifying customers of suspicious intrusions; (d) ensuring any third party software products to which they entrusted Plaintiff's and Class Members' PII were adequately and reasonably secure and was not vulnerable to exploitation; and (e) adequately notifying

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Plaintiff and Class Members about the types of data that were compromised in the Data Breach.

198.   Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

199.   Defendants' duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

200.   Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

201.   Episource and Sharp also had a common law duty to prevent foreseeable harm to others. This duty existed because Episource and Sharp stored valuable Private Information that is routinely targeted by cybercriminals. Plaintiff and Class Members were the foreseeable and probable victims of any compromise to inadequate data security practices maintained by Episource and Sharp.

202.   Episource and Sharp further assumed a duty of reasonable care in making representations in marketing materials and their respective Privacy Policies concerning data security.

203.   Episource and Sharp breached their duty owed to Plaintiff and Class Members, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

omissions committed by Defendants include, but are not limited to, the following:

      (a)   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

      (b)   Failing to adequately monitor the security of their networks and systems;

      (c)   Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

      (d)   Allowing unauthorized access to Class Members' Private Information, and;

      (e)   Failing to detect in a timely manner that Class Members' Private Information had been compromised.

204.   Defendants violated Section 5 of the FTCA and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

205.   Plaintiff and the Class are within the class of persons that the FTCA and HIPAA were intended to protect.

206.   The harm that occurred as a result of the Data Breach is the type of harm the FTCA and HIPAA were intended to guard against.

207.   Defendants' violation of Section 5 of the FTCA and HIPAA constitutes negligence.

208.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

209.   A breach of security, unauthorized access, and resulting injury to

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

210.   It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

211.   Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

212.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Plaintiff's and Class Members' Private Information, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

213.   It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to Plaintiff and Class Members.

214.   Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

215.   Defendants were in an exclusive position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

216.   Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

217.   Defendants have admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

218.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

219.   There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

220.   As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

221.   As a direct and proximate result of Defendants' negligence, Plaintiff and

1   the Class have suffered and will continue to suffer other forms of injury and/or harm,

2   including, but not limited to, anxiety, emotional distress, loss of privacy, and other

3   economic and non-economic losses.

4       222.   Additionally, as a direct and proximate result of Defendants' negligence,

5   Plaintiff and the Class have suffered and will suffer the continued risks of exposure

6   of their Private Information, which remain in Defendants' possession and is subject

7   to further unauthorized disclosures so long as Defendants fail to undertake appropriate

8   and adequate measures to protect the Private Information in its continued possession.

9       223.   Plaintiff and Class Members are entitled to compensatory and

10  consequential damages suffered as a result of the Data Breach.

11      224.   Defendants' negligent conduct is ongoing, in that it still holds the Private

12  Information of Plaintiff and Class Members in an unsafe and insecure manner.

13      225.   Plaintiff and Class Members are also entitled to injunctive relief

14  requiring Defendants to: (i) strengthen their data security systems and monitoring

15  procedures; (ii) submit to future annual audits of those systems and monitoring

16  procedures; and (iii) continue to provide adequate credit monitoring to all Class

17  Members.

18  <u>**Count II**</u>

19  <u>**Breach of Implied Contract (On behalf of Plaintiff and the Class)**</u>

20      226.   Plaintiff repeats and re-alleges the factual allegations above as if fully

21  set forth herein.

22      227.   As a condition of receiving medical treatment and/or services from

23  Sharp, Sharp required Plaintiff and Class Members to provide their Private

24  Information.

25      228.   In mandating that Plaintiff and Class Members provide their Private

26  Information, Sharp implied an assent to safeguard and protect their Private

27  Information.

28      229.   Plaintiff and Class Members provided their Private Information to

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS,, CALIFORNIA 91403

Defendants in exchange for (among other things) Defendants' promise to protect their Private Information from unauthorized disclosure and to delete it once it was no longer necessary to maintain the Private Information for business purposes. Defendants additionally promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

230. On information and belief, Defendants further promised to and represented they would comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

231. Plaintiff and Class Members provided their Private Information to Defendants in exchange for (among other things) Defendants' promise to protect their Private Information from unauthorized disclosure and to delete it once it was no longer necessary to maintain the Private Information for business purposes. Defendants additionally promulgated, adopted, and implemented written privacy policies whereby they expressly promised Plaintiff and Class Members that they would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

232. On information and belief, Defendants further promised to and represented they would comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

233. Implicit in the agreement between Plaintiff and Class Members and Defendants to provide Private Information, was Defendants' obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

234.    When Plaintiff and Class Members provided their Private Information to Defendants as a condition of obtaining services from Defendants, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

235.    Defendants required Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

236.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

237.    Plaintiff and Class Members would not have provided their Private Information to Defendants had they known that Defendants would not safeguard their Private Information as promised. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

238.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendants.

239.    Defendants breached their implied contracts with Plaintiff and Class Members by failing to safeguard their Private Information.

240.    As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and Class Members have suffered injuries in fact including (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data consisting of an increase

in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their Private Information.

241.   As a direct and proximate result of Sharp's breach of implied contract, Plaintiff and Class Members are entitled to damages, including compensatory damages, punitive damages, and/or nominal damages, in an amount to be proven at trial.

242.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## Count III

## Unjust Enrichment (On behalf of Plaintiff and the Class)

243.   Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

244.   Plaintiff brings this Count in the alternative to Count II above.

245.   Plaintiff and Class Members conferred a monetary benefit on Defendants by providing payments to Defendants (directly or indirectly), as well as by providing their valuable Private Information to Defendants.

246.   Plaintiff and Class Members provided Defendants their Private Information with the understanding that Defendants would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue derived therefrom. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such Private Information held by

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  Defendants.

2  247.  Upon information and belief, Defendants fund any data security

3  measures they implement entirely from their general revenues, including from money

4  they make (including that supplied by contractual payments directly or indirectly by

5  Plaintiff and Class Members) based upon representations of protecting Private

6  Information.

7  248.  Thus, there is a direct nexus between money paid to Defendants and the

8  requirement that Defendants keep Private Information confidential and protected.

9  249.  Plaintiff and Class Members paid Defendants, directly or indirectly, a

10 certain sum of money, which was used to fund any data security measures

11 implemented by Defendants.

12 250.  As such, a portion of the payments made by Plaintiff and Class Members

13 (or made on their behalf) is to be allocated to and used to provide a reasonable and

14 adequate level of data security, the amount of which is known to Defendants.

15 251.  Defendants benefited from receiving Plaintiff's and Class Members'

16 payments for services, whether directly or indirectly, and from receiving their Private

17 Information through its ability to retain and use that information for its own benefit.

18 Defendants understood and accepted this benefit.

19 252.  Defendants knew Plaintiff and Class members conferred a benefit which

20 Defendants accepted. Defendants profited from these transactions and used the

21 Private Information of Plaintiff and Class Members for business purposes.

22 253.  Protecting Private Information is integral to Defendants' businesses.

23 Without Private Information, Defendants would be unable to provide the business

24 services which comprise Defendants' core businesses.

25 254.  Plaintiff's and Class Members' Private Information has monetary value.

26 Thus, Plaintiff and Class Members conferred a monetary benefit on Defendants.

27 255.  Defendants also understood and appreciated that Plaintiff's and Class

28 Members' Private Information was private and confidential, and its value depended

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  upon Defendants maintaining the privacy and confidentiality of that information.

2  256.  Defendants collected and stored the Private Information provided by

3  Plaintiff and the Class to Defendants. In exchange, Plaintiff and Class Members

4  should have received from Defendants the services that comprise Defendants'

5  businesses and should have had the Private Information protected with adequate data

6  security.

7  257.  Defendants knew that Plaintiff and Class Members conferred a benefit

8  upon them and accepted and retained that benefit by accepting and retaining the

9  Private Information entrusted to them. Defendants profited from the Private

10 Information and used the Private Information for business purposes.

11 258.  Defendants failed to secure the Private Information and, therefore, did

12 not fully compensate Plaintiff and Class Members for the value that the Private

13 Information provided.

14 259.  If Plaintiff and Class Members had known that Defendants would not

15 use adequate data security practices, procedures, and protocols to adequately monitor,

16 supervise, and secure the Private Information, they would not have entrusted the

17 Private Information to Defendants or obtained services from Defendants.

18 260.  Plaintiff and Class Members have no adequate remedy at law.

19 261.  Defendants enriched themselves by saving the costs they reasonably

20 should have expended on data security measures to secure the Private Information.

21 Instead of providing a reasonable level of security that would have prevented the Data

22 Breach, Defendants instead calculated to increase their own profit at the expense of

23 Plaintiff and Class Members by utilizing cheaper, ineffective security measures and

24 diverting those funds to their own profit. Plaintiff and Class Members, on the other

25 hand, suffered as a direct and proximate result of Defendants' decisions to prioritize

26 their own profits over the requisite data security and the safety of Plaintiff's and Class

27 Members' Private Information.

28 262.  Under the circumstances, it would be unjust for Defendants to be

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1 | permitted to retain any of the benefits that Plaintiff and Class Members conferred
2 | upon them.

3 | 263.   As a direct and proximate result of Defendants' conduct, Plaintiff and
4 | Class Members have suffered and will suffer injury, including but not limited to: (i)
5 | invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value
6 | of their Private Information; (iv) lost time and opportunity costs associated with
7 | attempting to mitigate the actual consequences of the Data Breach; (v) lost
8 | opportunity costs associated with attempting to mitigate the actual consequences of
9 | the Data Breach; (vi) actual misuse of the compromised data consisting of an increase
10 | in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued
11 | and certainly increased risk to their Private Information, which: (a) remains
12 | unencrypted and available for unauthorized third parties to access and abuse; and (b)
13 | remains backed up in Defendants' possession and is subject to further unauthorized
14 | disclosures so long as Defendants fail to undertake appropriate and adequate measures
15 | to protect their Private Information.

16 | 264.   Plaintiff and Class Members are entitled to full refunds, restitution,
17 | and/or damages from Defendants and/or an order proportionally disgorging all profits,
18 | benefits, and other compensation obtained by Defendants from their wrongful
19 | conduct. This can be accomplished by establishing a constructive trust from which
20 | Plaintiff and Class Members may seek restitution or compensation.

21 | 265.   Plaintiff and Class Members may not have an adequate remedy at law
22 | against Defendants, and accordingly, they plead this claim for unjust enrichment in
23 | addition to, or in the alternative to, other claims pleaded herein.

24 | ## Count IV

25 | **Invasion of Privacy – Intrusion Upon Seclusion (On behalf of Plaintiff and the**
26 | **Class)**

27 | 
28 | 266.   Plaintiff repeats and re-alleges the factual allegations above as if fully

set forth herein.

267. Defendants intentionally intruded into a matter as to which Plaintiff and Class Members had a reasonable expectation of privacy, and that intrusion was highly offensive to a reasonable person.

268. Defendants intentionally intruded upon the solitude, seclusion and private affairs of Plaintiff and Class Members by intentionally configuring their systems in such a way that left them vulnerable to a cyber-attack, thus permitting unauthorized access to their systems, which compromised Plaintiff's and Class Members' Private Information. Only Defendants had control over its systems.

269. At all times, Defendants were aware that Plaintiff's and Class Members' Private Information in their possession contained highly sensitive and confidential Private Information.

270. Plaintiff and Class Members have a reasonable expectation of privacy in their Private Information, which also contains highly sensitive medical information.

271. Defendants intentionally configured their systems in such a way that stored Plaintiff's and Class Members' Private Information to be left vulnerable to cyber-attack without regard for Plaintiff's and Class Members' privacy interests.

272. The disclosure of the sensitive and confidential Private Information of Plaintiff and millions of Class Members, was highly offensive to Plaintiff and Class Members because it violated expectations of privacy that have been established by general social norms, including by granting access to information and data that is private and would not otherwise be disclosed.

273. Defendants' conduct would be highly offensive to a reasonable person in that it violated statutory and regulatory protections designed to protect highly sensitive information, in addition to social norms. Defendants' conduct would be especially egregious to a reasonable person as Defendants publicly disclosed Plaintiff's and Class Members' sensitive and confidential personal information without their consent, to an "unauthorized person," i.e., hackers.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

274. As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

275. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' intrusion upon seclusion and are entitled to just compensation.

276. Plaintiff and Class Members are entitled to appropriate relief, including compensatory damages for the harm to their privacy, loss of valuable rights and protections, and heightened stress, fear, anxiety and risk of future invasions of privacy.

## Count V

## Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* (On behalf of Plaintiff and the Class)

277. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

278. Defendants are "person[s]" as defined by Cal. Bus. & Prof. Code § 17201.

279. Defendants violated Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

280. Defendants' violations of the UCL were prepared, directed, and emanated from Defendants' California headquarters and from where they maintain their principal corporate offices in California.

281. Defendants' "unfair" acts and practices include:

(a)    Defendants failed to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Defendants' Data Breach;

    (b)    Defendants failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents and known coding vulnerabilities in the industry;

    (c)    Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including HIPAA, the FTC Act (15 U.S.C. § 45), California's Customer Records Act (Cal. Civ. Code § 1798.80 *et seq.*), and California's Consumer Privacy Act (Cal. Civ. Code § 1798.150);

    (d)    Defendants' failure to implement and maintain reasonable security measures also led to substantial injuries to Plaintiff and Class Members, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Plaintiff and Class Members could not know of Defendants' inadequate security, they could not have reasonably avoided the harms that Defendants caused; and

    (e)    Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

282. Defendants have engaged in "unlawful" business practices by violating multiple laws, including HIPAA, the FTC Act, 15 U.S.C. § 45, and California common law.

283. Defendants' unlawful, unfair, and deceptive acts and practices include:

    (a)    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members'

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Private Information, which was a direct and proximate cause of the Defendants' Data Breach;

(b)     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Defendants' Data Breach;

(c)     Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Defendants' Data Breach;

(d)     Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' Private Information, including by implementing and maintaining reasonable data security measures;

(e)     Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45;

(f)     Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

(g)     Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45.

284.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data

1  security and ability to protect the confidentiality of consumers' personal information.

2      285.   As a direct and proximate result of Defendants' unfair, unlawful, and

3  fraudulent acts and practices, Plaintiff and Class Members were injured and lost

4  money or property, which would not have occurred but for the unfair and deceptive

5  acts, practices, and omissions alleged herein, time and expenses related to

6  monitoring their financial accounts for fraudulent activity, an increased, imminent

7  risk of fraud and identity theft, and loss of value of their personal information.

8      286.   Defendants' violations were, and are, willful, deceptive, unfair, and

9  unconscionable.

10     287.   Plaintiff and Class Members have lost money and property as a result

11 of Defendants' conduct in violation of the UCL, as stated herein and above.

12     288.   By deceptively storing, collecting, and disclosing their Private

13 Information, Defendants have taken money or property from Plaintiff and Class

14 Members. Had Plaintiff and Class Members known that Defendants would fail to

15 implement reasonable data security polices they would not have provided their

16 Private information to Defendants.

17     289.   Defendants acted intentionally, knowingly, and maliciously to violate

18 California's Unfair Competition Law, and recklessly disregarded Plaintiff's and

19 Class Members' rights.

20     290.   Plaintiff and Class Members seek all monetary and nonmonetary relief

21 allowed by law, including restitution of all profits stemming from Defendants'

22 unfair, unlawful, and fraudulent business practices or use of their Private

23 information; declaratory relief; reasonable attorneys' fees and costs under California

24 Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable

25 relief, including public injunctive relief.

26 / / /

27 / / /

28 / / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS,, CALIFORNIA 91403

## Count VI

## Violation of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.* (On behalf of Plaintiff and the Class)

291.   Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

292.   Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization[.]"

293.   Sharp is a "provider of health care" within the meaning of Civil Code § 56.05(0), Episource is a "contractor" within the meaning of Civil Code § 56.05(d) and/or a "business organized for the purpose of maintaining medical information" and/or a "business that offers software or hardware to consumers . . . that is designed to maintain medical information" within the meaning of Civil Code § 56.06(a) and (b), and Defendants maintained and continue to maintain "medical information," within the meaning of Civil Code § 56.05(j), for "patients," within the meaning of Civil Code § 56.05(k).

294.   Plaintiff and Class Members are "patients" within the meaning of Civil Code § 56.05(k) and are "endanger[ed]" within the meaning of Civil Code § 56.05(e) because Plaintiff and Class members fear that disclosure of their medical information could subject them to harassment or abuse.

295.   Plaintiff and Class Members, as patients, had their individually identifiable "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored on Defendants' computer networks at the time of the unauthorized disclosure.

296.   Defendants, through inadequate security, allowed unauthorized third-party access to Plaintiff's and Class Members' medical information, without the prior

68

**CLASS ACTION COMPLAINT**

written authorization of Plaintiff and Class Members, as required by Civil Code § 56.10 of the CMIA.

297.  In violation of Civil Code § 56.10(a), Defendants disclosed Plaintiff's and Class Members' medical information without first obtaining an authorization. Plaintiff's and Class Members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.10(a).

298.  In violation of Civil Code § 56.10(e), Defendants further disclosed Plaintiff's and Class Members' medical information to persons or entities not engaged in providing direct health care services to Plaintiff or Class Members, or to their providers of health care or health care service plans or their insurers or self-insured employers.

299.  Defendants violated Civil Code § 56.101 of the CMIA through its willful and knowing failure to maintain and preserve the confidentiality of the medical information of Plaintiff and the Class Members. Defendants' conduct with respect to the disclosure of confidential Private Information was willful and knowing because Defendants designed and implemented the computer networks and security practices that gave rise to the unlawful disclosure.

300.  In violation of Civil Code § 56.101(a), Defendants created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and Class Members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiff's and Class Members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.101(a). 380. In violation of Civil Code § 56.101(a), Defendants negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and Class Members' medical information. Plaintiff's and Class Members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  Civil Code § 56.101(a).

2      301.   Plaintiff's and Class Members' medical information that was the subject

3  of the unauthorized disclosure included "electronic medical records" or "electronic

4  health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. §

5  17921(5).

6      302.   In violation of Civil Code § 56.101(b)(1)(A), Defendants' electronic

7  health record systems or electronic medical record systems failed to protect and

8  preserve the integrity of electronic medical information. Plaintiff's and Class

9  Members' medical information was viewed by unauthorized individuals as a direct

10  and proximate result of Defendants' violation of Civil Code § 56.101(b)(1)(A).

11      303.   Defendants violated Civil Code § 56.36 of the CMIA through its failure

12  to maintain and preserve the confidentiality of the medical information of Plaintiff

13  and the Class Members.

14      304.   As a result of Defendants' above-described conduct, Plaintiff and Class

15  Members have suffered damages from the unauthorized disclosure and release of their

16  individual identifiable "medical information" made unlawful by Civil Code §§ 56.10,

17  56.101, 56.36. 385. As a direct and proximate result of Defendants' above-described

18  wrongful actions, inaction, omissions, and want of ordinary care that directly and

19  proximately caused the unauthorized disclosure, and violation of the CMIA, Plaintiff

20  and Class Members have suffered (and will continue to suffer) economic damages

21  and other injury and actual harm in the form of, inter alia, (i) an imminent, immediate

22  and the continuing increased risk of identity theft, identity fraud and medical fraud-

23  risks justifying expenditures for protective and remedial services for which they are

24  entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of

25  their Private Information, (iv) statutory damages under the California CMIA, (v)

26  deprivation of the value of their Private Information, for which there is a well-

27  established national and international market, and/or (vi) the financial and temporal

28  cost of monitoring their credit, monitoring their financial accounts, and mitigating

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   their damages.

2   305.   Plaintiff, individually and for each member of the Class, seeks nominal

3   damages of one thousand dollars ($1,000) for each violation under Civil Code §

4   56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2),

5   injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each

6   Class Member, and attorneys' fees, litigation expenses and court costs, pursuant to

7   Civil Code § 56.35.

8                              **PRAYER FOR RELIEF**

9       **WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests

10  judgment against Defendants and that the Court grant the following:

11  A.   An Order certifying the Class, and appointing Plaintiff and her Counsel

12       to represent the Class;

13  B.   Equitable relief enjoining Defendants from engaging in the wrongful

14       conduct complained of herein pertaining to the misuse and/or disclosure

15       of the Private Information of Plaintiff and Class Members;

16  C.   Injunctive relief, including but not limited to, injunctive and other

17       equitable relief as is necessary to protect the interests of Plaintiff and

18       Class Members, including but not limited to an order:

19       i.   prohibiting Defendants from engaging in the wrongful and unlawful

20            acts described herein;

21       ii.  requiring Defendants to protect, including through encryption, all

22            data collected through the course of their business in accordance with

23            all applicable regulations, industry standards, and federal, state or

24            local laws;

25       iii. requiring Defendants to delete, destroy, and purge the Private

26            Information of Plaintiff and Class Members unless Defendants can

27            provide to the Court reasonable justification for the retention and use

28            of such information when weighed against the privacy interests of

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Plaintiff and Class Members;

iv.   requiring Defendants to pay out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, for Plaintiff's and Class Members' lifetimes;

v.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

vi.   requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.  requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.   requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendants' networks is compromised, hackers cannot gain access to portions of Defendants' systems;

x.    requiring Defendants to conduct regular database scanning and securing checks;

xi.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

xii.   requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and how to respond to a breach;

xiii.   requiring Defendants to implement testing systems to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, and randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting Private Information;

xiv.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for internal and external threats, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to unauthorized third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii.   for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance

of the Court's final judgment;

D.     For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.     For prejudgment interest on all amounts awarded; and

G.     Such other and further relief as this Court may deem just and proper.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1

## **<u>JURY TRIAL DEMANDED</u>**

2

Plaintiff hereby demands a trial by jury on all claims so triable.

3  Dated: June 23, 2025                    **PEARSON WARSHAW, LLP**

4

5                                          By:    */s/ Daniel L. Warshaw*

6                                                 DANIEL L. WARSHAW

7                                          DANIEL L. WARSHAW (Bar No. 185365)
8                                          dwarshaw@pwfirm.com
                                           MATTHEW A. PEARSON (Bar No. 291484)
9                                          mapearson@pwfirm.com
10                                         **PEARSON WARSHAW, LLP**
                                           15165 Ventura Boulevard, Suite 400
11                                         Sherman Oaks, California 91403
                                           Telephone: (818) 788-8300
12                                         Facsimile:   (818) 788-8104
13
14                                         STEVEN M. NATHAN (Bar No. 153250)
                                           snathan@hausfeld.com
15                                         **HAUSFELD LLP**
16                                         33 Whitehall Street
                                           Fourteenth Floor
17                                         New York, NY 10004
                                           Telephone: (646) 357-1100
18                                         Facsimile: (212) 202-4322
19
20                                         James J. Pizzirusso*
                                           Nicholas U. Murphy*
21                                         **HAUSFELD LLP**
22                                         1201 17th Street N.W., Suite 600
                                           Washington, D.C. 20036
23                                         Tel: 202.540.7200
24                                         jpizzirusso@hausfeld.com
                                           nmurphy@hausfeld.com
25
26                                         *Attorneys for Plaintiff*

27                                         **pro hac vice forthcoming*

28

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403